# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-2681
_____

United States of America

*Plaintiff - Appellee*

v.

Daryl Warren

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: March 13, 2015
Filed: June 5, 2015

_____

Before MURPHY and SHEPHERD, Circuit Judges, and HARPOOL,[1] District
Judge.

_____

MURPHY, Circuit Judge.

An undercover agent working for the Bureau of Alcohol, Tobacco, Firearms
and Explosives (ATF) recruited Daryl Warren and two other men, Michael Twitty and

---

[1] The Honorable M. Douglas Harpool, United States District Judge for the
Western District of Missouri, sitting by designation.

Robert Washington, to rob a home in St. Louis reportedly being used to store cocaine. After Warren, Twitty, and Washington had agreed to the robbery, they were arrested and charged with various drug and firearm offenses. A jury convicted Warren of conspiring to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846, possessing a firearm in furtherance of a drug trafficking conspiracy, in violation of 18 U.S.C. § 924(c), and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2). The district court[2] sentenced Warren to 211 months imprisonment followed by a five year term of supervised release. Warren appeals, raising several arguments related to the investigation, the trial evidence, and his sentence. We affirm.

In 2009 the ATF implemented Operation Gideon, a series of undercover sting operations designed to arrest criminals who were robbing locations where drugs were stored. Rather than planting drugs in such locations with the expectation of making arrests, the ATF developed an alternative technique. Undercover ATF agents would describe a fictitious location to suspects and support plans for gaining access to it. When suspects were later about to carry out such a plan, they were arrested. The ATF used this technique in St. Louis, Missouri from April to June 2013 following increased violence in drug related robberies.

The investigation and arrest of Warren involved two confidential informants and Richard Zayas, an undercover ATF agent. On May 21, 2013 the confidential informants purchased an ounce of cocaine from Warren's cousin, Robert Washington. The informants subsequently introduced Washington to Zayas, who purchased another ounce of cocaine from Washington. During this purchase, Zayas claimed that he was a disgruntled drug courier looking for a crew to help him rob a Mexican drug

[2] The Honorable Catherine D. Perry, Chief Judge, United States District Judge for the Eastern District of Missouri.

cartel of large amounts of cocaine. Washington said that he knew people who were "involved in this type of activity" and agreed to organize a meeting with them at a future date.

On June 3, 2013 Washington introduced Zayas to Warren and Michael Twitty in a grocery store parking lot. Zayas told them his cover story: he was a cocaine courier for a group of Mexican drug dealers and was unhappy with the pay he was receiving. He was interested in robbing the Mexican drug dealers to make up for his low pay. Zayas claimed that a few times each month he would receive a call from Mexican dealers informing him that they had some drugs ready for transportation at a particular house. He would have a few minutes to pick up the drugs or they would be moved to a new location. They told him that on entry to the house he would see two Mexican men, one of whom would be carrying a pistol. The other man would go to a back room and retrieve five to six kilograms of cocaine to give to Zayas, then tell him where to make the delivery. Zayas claimed that each time he went to the house, he could see anywhere from 20 to 22 kilograms of cocaine stored in a back room. As Zayas finished telling the story, Warren declared that "they could handle the robbery" and he had "one more guy" who would help out.

The group convened again the next day. On behalf of "his people," Warren asked Zayas where the house was located, what it looked like, how many guards would be present outside, and whether there would be only one man guarding the cocaine in the back room. After Zayas answered the questions, Warren agreed to use a "trap car" with a secret back seat compartment to transport the cocaine from the house. One of the confidential informants asked whether there would be any problems "unloading" the cocaine, and Warren replied, "nah, nah, man we good." The group then discussed who would enter the house first and who would follow behind, and everyone agreed to commit the robbery the following afternoon. When asked for his final thoughts on the plan, Warren replied, "I think it's pretty good. It's gonna be like a little shootout though."

When they gathered on June 5, 2013, Warren told Zayas that a fourth man would meet them at the cocaine house and that he would instruct that man after they arrived. Although Zayas wanted to meet the fourth man before the robbery to ensure he understood the plan, Warren emphasized, "I'm the orchestrator. I'm the orchestrator. [I will tell] him know what to do." Warren also declared that if anything went wrong at the house, he "didn't need [his] people taking no fall for nothing, if you know what I'm saying." Zayas then showed Warren, Twitty, and Washington how to operate the hidden compartment of the "trap car." As he opened the compartment, ATF officers emerged from a nearby parking lot and arrested them. The officers searched Warren's car and found a semiautomatic pistol and an assault rifle, both loaded. Two pairs of gloves, a red bandana, and two knives were found in the glove compartment.

A grand jury returned a five count indictment against Warren, Washington, and Twitty. Warren was charged in three counts for conspiring to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and § 846, possessing a firearm in furtherance of a drug trafficking conspiracy, in violation of 18 U.S.C. § 924(c), and being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2). While Washington and Twitty pled guilty, Warren proceeded to trial. At a pretrial conference, the government moved to introduce Rule 404(b) evidence pertaining to Warren's prior convictions for possession of a controlled substance and felon in possession of a firearm in 2007, drug trafficking and possession of a controlled substance in 2001, and possession of a controlled substance in 1999. The district court granted the motion, concluding that the convictions qualified as "other act" evidence of Warren's guilt under Rule 404(b).

During jury selection the government struck two black jurors, Juror 5 and Juror 21, and Warren challenged the strikes under Batson v. Kentucky, 476 U.S. 79 (1986). In defending the peremptory strikes, the government argued that Juror 5 and Juror 21 were the only members of the panel who had not answered any general questions

during voir dire. The district court agreed with the government, finding that both jurors had failed to respond to questions asked by counsel during voir dire and that this silence was a nondiscriminatory reason for the strikes.

While Warren did not testify at trial, Zayas and the two confidential informants testified about his involvement in the conspiracy to rob the home. Over Warren's renewed objections, the government introduced evidence of his prior convictions under Federal Rule of Evidence 404(b). The district court instructed the jury not to consider the evidence as proof of his criminal propensity, but only as proof of his knowledge and intent. It then instructed on Warren's entrapment defense, stating that the "law allows the government to use undercover agents, deception, and other methods to present a person already willing to commit a crime with the opportunity to commit a crime, but the law does not allow the government to persuade an unwilling person to commit a crime." The jury convicted Warren of all counts.

At sentencing Warren objected to portions of his presentence report, arguing that he was a victim of sentencing entrapment because "no drugs were ever involved in this case" and he did not have the ability to distribute over 15 kilograms of cocaine. The district court overruled the objections, sentencing Warren to 211 months imprisonment followed by a five year term of supervised release. Warren now appeals his conviction and sentence. He contends that the government failed to prove beyond a reasonable doubt that he was not entrapped. He also asserts that the reverse sting operation was outrageous government conduct in violation of the Fifth Amendment and that the trial court erred in admitting evidence of his prior convictions under Rule 404(b), denying his Batson challenges, and incorrectly calculating the amount of cocaine for which he was responsible.

Warren first argues that the government presented insufficient evidence to support the jury's finding that he had not been entrapped. We review de novo the sufficiency of the evidence, resolving conflicts in favor of the government, viewing

the evidence in the light most favorable to the government, and accepting all reasonable inferences that support the verdict. See United States v. Martin, 777 F.3d 984, 992 (8th Cir. 2015). The entrapment defense "recognizes that law enforcement officers go too far when they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." United States v. Williams, 720 F.3d 674, 697 (8th Cir. 2013). Entrapment has two elements: government inducement and a lack of predisposition on the part of the defendant to engage in the crime. Mathews v. United States, 485 U.S. 58, 62 (1988).

Inducement occurs when the government creates a substantial risk that an otherwise law abiding person will commit a criminal offense. United States v. Myers, 575 F.3d 801, 806 (8th Cir. 2009). While inducement takes many forms, it requires more than a favorable opportunity to commit a crime. United States v. Bugh, 701 F.3d 888, 893 (8th Cir. 2012). Predisposition, the "principal element" of the defense, focuses on whether the defendant was an "unwary innocent" or an "unwary criminal" who readily accepted the chance to commit the crime. Williams, 720 F.3d at 697. Since the district court instructed the jury on the entrapment defense, the government had the burden to prove beyond a reasonable doubt that it did not induce the crime or that Warren was predisposed to commit the crime. See Bugh, 701 F.3d at 893 n.5.

Warren asserts that the government induced his participation in the robbery and that he was not predisposed to commit the crime. The evidence at trial, however, showed that the government had simply offered him an opportunity to commit the robbery and that he had eagerly embraced it. See Bugh, 701 F.3d at 893. Minutes after Zayas told the group his cover story, Warren stated that "they could handle the robbery" and he had "one more guy" who would help. Warren then questioned Zayas about the location of the house and agreed to use the "trap car" to transport the drugs from that location. He took charge again at the final meeting and explained that he was the "orchestrator" and that he had recruited a fourth man to help carry out the

-6-

robbery. Absent government threat, coercion, cajoling, and the like, the evidence at trial supported a finding that the government did not induce Warren other than by making the crime available to him. See, e.g., United States v. Abumayyaleh, 530 F.3d 641, 646–47 (8th Cir. 2008).

Even if the government had failed to prove beyond a reasonable doubt that it did not induce the crime, the evidence at trial showed that Warren was predisposed to commit it. Notably Washington, rather than a government agent, recruited Warren since he had already been "involved in this type of activity." This indicated that Warren "possessed the requisite predisposition prior to the [g]overnment's investigation." United States v. Brooks, 215 F.3d 842, 846 (8th Cir. 2000). He had met with Zayas on his own accord and accepted the opportunity presented without hesitation. See United States v. Young, 613 F.3d 735, 748 (8th Cir. 2010); see also United States v. Searcy, 284 F.3d 938, 943 (8th Cir. 2002). With Warren's prior convictions for drug trafficking and possession, his ready response to minimal inducement indicates criminal inclination. See Myers, 575 F.3d at 805; see also Williams, 702 F.3d at 697. Because a reasonable jury could find that the evidence at trial proved beyond a reasonable doubt that Warren was predisposed to participate in the robbery and that the government did not induce his participation in the crime, his entrapment defense has not succeeded. See Bugh, 701 F.3d at 894.

For the first time on appeal, Warren also argues that the fictitious nature of the operation made the investigation so outrageous as to warrant dismissal of the indictment. Outrageous government conduct claims involve alleged defects in the "institution of the prosecution," questions of law a court should decide before trial. United States v. Jorgensen, 144 F.3d 550, 561 (8th Cir. 1998). If the defense is not made in a pretrial motion to dismiss under Federal Rule of Criminal Procedure 12(b)(3), it is therefore waived absent good cause. See Fed. R. Crim. P. 12(c)(3); United States v. Mausali, 590 F.3d 1077, 1080–81 (9th Cir. 2010) (collecting cases). Warren thus waived his outrageous government conduct defense by failing to raise

it before trial.  See United States v. Henderson-Durand, 985 F.2d 970, 973 (8th Cir. 1993).  Although relief from waiver may be granted when a defendant shows good cause for his failure to raise the issue in a timely manner, Warren has not offered any such explanation.  See id. at 973–74.  We thus decline to review the merits of this claim.

Warren next asserts that the district court erred in admitting evidence of his prior convictions.  See Fed. R. Evid. 404(b).  We review the admission of "other act" evidence for an abuse of discretion and reverse "only when the evidence clearly had no bearing on the case and was introduced solely to show defendant's propensity to engage in criminal misconduct."  United States v. Young, 753 F.3d 757, 767 (8th Cir. 2014).  Other act evidence may be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  The evidence must be relevant, proved by a preponderance of the evidence, more probative than prejudicial, and similar in kind and close in time to the crime charged.  Young, 753 F.3d at 768.

Warren contends that the district court abused its discretion by admitting evidence of his prior crimes because they were not close in time to the charged crimes.  His oldest conviction was in 1999 for possession of a controlled substance, nearly fifteen years before these similar charges of conspiring to possess with intent to distribute cocaine.  Although there is no absolute rule about remoteness in time, we have upheld the introduction of fifteen year old convictions that were similar to the crime charged.  See United States v. Yielding, 657 F.3d 688, 702 (8th Cir. 2011).  Even more remote convictions have been upheld when a defendant has been in custody for much of the intervening time period.  See United States v. Strong, 415 F.3d 902, 905–06 (8th Cir. 2005) (sixteen years); United States v. Walker, 470 F.3d 1271, 1275 (8th Cir. 2006) (eighteen years); United States v. Williams, 308 F.3d 833, 836–37 (8th Cir. 2002) (twenty years).  Here, Warren was imprisoned or on probation from May 1999 until November 2004, and again from August 2007 until August

2012. He had been out of prison for only five years before committing the offenses at issue here. See Walker, 470 F.3d at 1275. Under these circumstances, the 1999 conviction was not so remote in time as to render the district court's decision an abuse of discretion. See, e.g., Yielding, 657 F.3d at 702.

We also reject Warren's argument that the Rule 404(b) evidence was more prejudicial than probative. Evidence of his prior convictions for possession of a controlled substance and drug trafficking had substantial probative value on the issues of knowledge and intent. See, e.g., United States v. Adams, 401 F.3d 886, 894 (8th Cir. 2005). The district court limited any prejudice to Warren by giving a limiting instruction, directing the jury not to consider the evidence as proof of his character or criminal propensity, but only as proof of his knowledge and intent. See United States v. Brumfield, 686 F.3d 960, 963 (8th Cir. 2012). We thus conclude that the district court did not abuse its discretion by admitting the Rule 404(b) evidence.

Warren further argues that the district court erred in denying his Batson challenges after the government struck two black jurors, Jurors 5 and 21. The Fourteenth Amendment prohibits the use of peremptory challenges to strike jurors solely on the basis of race. Batson, 476 U.S. at 85. If a party makes a prima facie showing that a peremptory strike is race based, the proponent must provide a race neutral reason for the strike. United States v. Ellison, 616 F.3d 829, 832 (8th Cir. 2010). The district court must then decide whether the objecting party has shown purposeful race discrimination. Id. Since those findings turn on credibility determinations, they are due great deference and our review is for clear error. Id.

Throughout voir dire, Jurors 5 and 21 were the only potential jurors who remained silent during the general questions asked by the district court, the government, and defense counsel. They did not volunteer information regarding their views on law enforcement or knowledge of controlled substances. Nor did they respond to questions about any familiarity with the issues in the case. The only time

they spoke was when the district court asked them whether they were employed. Juror 21 replied that she had worked as a dishwasher, and Juror 5 answered that she had worked at a printing company. The prosecutor subsequently struck both. In response to Warren's objections, the prosecutor stated that Jurors 5 and 21 "were the only two jurors on the entire panel [who] did not answer any of the general questions." Although both jurors answered direct questions about their employment, the prosecutor argued that such information "should have been [included] on [their] questionnaire to begin with, but they did not answer." The court agreed with the prosecutor, finding that the silence of Jurors 5 and 21 was a race neutral reason for the peremptory strikes.

Warren now argues that silence is not a race neutral reason for striking a juror. We disagree. Passivity, inattentiveness, and confusion are common race neutral reasons for striking jurors. See, e.g., Young, 753 F.3d at 780–82. Silence is a similar reason, for it too reflects "body language and demeanor" rather than race, id. at 780 n.7, and a party should not be required to assume the risk of a juror about whom little information has been made available, see McCurdy v. Montgomery Cnty., 240 F.3d 512, 521–22 (6th Cir. 2001). The district court recognized as much in denying Warren's objections, finding that the government was unable to glean any relevant information about Juror 5 or Juror 21 because of their silence. We afford great deference to such a finding, see Ellison, 616 F.3d at 832, and thus conclude that the district court did not err in denying the Batson challenges to the government's peremptory strike of Jurors 5 or 21, see United States v. Meza-Gonzalez, 394 F.3d 587, 593–94 (8th Cir. 2005); see also Smulls v. Roper, 535 F.3d 853, 865–69 (8th Cir. 2008) (en banc) (affirming denial of Batson challenge where juror's silence was a reason for peremptory strike).

Finally, Warren raises a sentencing entrapment claim. He asserts that the district court sentenced him as for a conspiracy to distribute at least 15 kilograms of cocaine, far exceeding the quantity he would have been able to distribute. See

U.S.S.G. § 2D1.1(c)(3). Sentencing entrapment occurs when government "conduct leads an individual otherwise indisposed to dealing in a large quantity [of] controlled substance to do so, and the result is a higher sentence." United States v. Martin, 583 F.3d 1068, 1073 (8th Cir. 2009). The critical question is whether the defendant was "predisposed to deal only in small quantities of drugs." United States v. Ruiz, 446 F.3d 762, 775 (8th Cir. 2006). To make out this defense a defendant must prove that he had neither the intent nor the ability to deal in the quantity of drugs alleged by the government. Id. Sentencing entrapment is a factual finding reviewed for clear error. See id.

The evidence at trial showed that Warren had expected to steal at least 15 kilograms of cocaine and that he had the ability to distribute that amount. After he learned that the targeted location contained 20 to 22 kilograms of cocaine, an undercover agent asked him whether there would be any problems "unloading" the drugs. Warren replied, "nah, nah, man we good." Given this unequivocal statement, Warren cannot show that he had neither the intent nor the ability to distribute at least 15 kilograms of cocaine. See Ruiz, 446 F.3d at 775–76; see also Searcy, 284 F.3d at 942–43. Nor can he show that he was predisposed to deal only in small quantities of cocaine. As his prior convictions show, Warren was a convicted drug dealer who was released from prison only five years before the conduct at issue here. See United States v. Booker, 639 F.3d 1115, 1119 (8th Cir. 2011); United States v. Hunt, 171 F.3d 1192, 1196 (8th Cir. 1999). The district court thus did not clearly err in sentencing Warren based on a conspiracy to distribute over 15 kilograms of cocaine.

To the extent Warren argues in passing that sentencing entrapment claims "should be submitted to the jury as part of the entrapment instruction," see United States v. Cortes, 732 F.3d 1078 (9th Cir. 2013), the Federal Rules of Appellate Procedure require more. Under Rule 28(a)(8)(A), an appellant must adequately explain his "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8)(A). Since

Warren has failed to go beyond a cursory assertion of this argument in his opening brief and made no mention of it in his reply brief or at oral argument, we refuse to consider the merits of the issue. <u>See</u> <u>United States v. Chipps</u>, 410 F.3d 438, 446–47 (8th Cir. 2005); <u>United States v. Gonzales</u>, 90 F.3d 1363, 1369–70 (8th Cir. 1996).

For the foregoing reasons, we affirm the judgment of the district court.

_____